# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| ULTIMATE ESCAPES HOLDINGS, LLC, *et al.*, | : | Bankr. Case No. 10-12915-BLS |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| EDWARD T. GAVIN, Trustee of the | : | |
| UE Liquidating Trust, on behalf of the Estates of | : | |
| Ultimate Escapes Holdings, LLC, *et al.*, | : | |
| | : | Civ. No. 15-241-RGA |
| Plaintiff, | : | Adv. No. 12-50849-BLS |
| | : | |
| v. | : | |
| | : | |
| JAMES M. TOUSIGNANT and RICHARD KEITH, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Todd H. Bartels, Esq., Shanti M. Katona, Esq., Christopher A. Ward, Esq., Polsinelli PC, Wilmington, DE, attorneys for Appellant Edward T. Gavin, Trustee of the UE Liquidating Trust, on behalf of the Estates of Ultimate Escapes Holdings, LLC, *et al.*

Marc S. Casarino, Esq., Michael N. Onufrak, Esq., White & Williams, LLP, Wilmington, DE, attorneys for Appellee, James M. Tousignant.

John J. Barrett, Jr., Esq., Arthur D. Kuhl, Esq., Louis J. Rizzo, Jr., Esq., Reger, Rizzo & Darnall, LLP, Wilmington, DE, attorneys for Appellee, Richard Keith.

February **23**, 2016

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This matter arises from a complaint for breach of fiduciary duty brought by Edward T. Gavin, Trustee of the UE Liquidating Trust, on behalf of the estates of Ultimate Escapes Holdings, LLC, *et al.* ("UE"), against UE's former officer and director James M. Tousignant and former director Richard Keith ("Defendants"). Trustee contends that Tousignant and Keith breached their fiduciary duties of care, loyalty, and good faith owed to UE and its creditors by entering into an Agreement between UE and Club Holdings, LLC ("CH"), dated August 6, 2010 ("Agreement").

Prior to the commencement of the chapter 11 cases, Tousignant served as UE's President and Chief Executive Officer and was a member of the board of directors ("Board"). Keith served as chairman of the Board. In addition to Tousignant and Keith, the Board also included C. Thomas McMillen, Mark A. Frantz, and Stephen Griessel ("Outside Directors"). UE was a luxury destination club offering a portfolio of 119 high-end vacation residences and related services to about 1,250 members. Members gained access to the vacation properties and travel services by entering into membership agreements, which involved a one-time initiation fee ranging from $100,000 to $300,000 and annual membership dues ranging from $5,000 to over $30,000. Members were also charged ad hoc fees for certain add-on services, such a ski lift tickets or a personal chef. The combination of initiation fees, membership dues, and ad hoc fees was UE's primary source of revenue. Club members were generally high net-worth or high-income individuals, and UE maintained a proprietary database of club members' information (the "Membership Information"), which was valued at over $14.5 million in the company's mid-2010 10-Q Report filed with the SEC. (*See* D.I. 4 at p. 57). The Membership Information, together with the most of UE's real estate, served as collateral for a revolving loan issued by UE's principal lender, CapitalSource, Inc. ("CapSource"). Tousignant and Keith also each personally guaranteed the loan. As of June 30, 2010, the balance on the CapSource loan was $89.8 million.

2

In early 2010, less than six months after its creation, UE faced significant financial difficulties. UE began merger discussions with its direct competitor CH, whose secured lender was also CapSource. Pursuant to a Confidentiality Agreement dated March 1, 2010, UE and CH started due diligence and agreed to exchange confidential business information, including their respective "member lists and information" for the exclusive purpose of evaluating a possible merger. (*See* D.I. 4 at pp. 810-15). UE and CH also executed a Confidential Letter of Intent ("LOI") on April 30, 2010, in which CH proposed a transfer to UE of the assets and liabilities of CH in exchange for an equity interest in UE under a contribution agreement. (*See id.* at pp. 1043-49). The contribution agreement that evolved was a 75-page merger document, which was executed by the parties on July 2, 2010, with signature pages placed into escrow. The parties intended to complete due diligence and close the merger transaction by the end of July, 2010. (*See id.* at p. 1044, ¶ 5 (LOI provision regarding closing); *see also* D.I. 7 at p. 84 (contribution agreement was signed and escrowed July 2, 2010)). Together, these documents bound the parties to keep the terms of the confidential transaction confidential. Merger discussions continued throughout the spring and summer of 2010.

During this period, UE continued to face financial difficulties. In late spring 2010, UE entered into a factoring agreement with Monterey Financial Services, in which UE agreed to repay Monterey approximately $2 million from anticipated receivables in exchange for a cash advance. (*See* D.I. 7 at 109-12). The factoring agreement had the effect of cutting off cash flow to UE through the end of July. During the summer months, certain cash shortfalls were covered by personal advances from Tousignant and Keith, as they attempted to keep the company alive long enough to close the merger with CH. Keith contributed $100,000 for mortgage payments on certain properties, and Tousignant contributed $50,000 to cover an interest payment to CapSource. (*See* D.I. 4 at pp. 461-63, 616; *see also* D.I. 7 at p. 78).

As spring 2010 transitioned into summer, the UE Board viewed a merger with CH – referred

to by the Board as "Project Bond" – as the best route forward. (*See* D.I. 4 at p. 1027 (Minutes of

June 10, 2010 Board meeting); D.I. 7 at pp. 88, 107-08; *see also* D.I. 7 at p. 340, ¶ 52 (noting

merger with CH was referred to as "Project Bond")). In the minutes of the June 10, 2010 Board

meeting, under the subheading "Project Bond," UE's Board adopted the following resolutions:

> RESOLVED, that the company and Mr. Tousignant as CEO is authorized to proceed
> to finalize and execute the contribution agreement for Project Bond, with the signatures to
> be held in attorney escrow.
>
> RESOLVED, FURTHER, that the Authorized Officers of the Corporation be, and
> each hereby is, authorized and empowered, for and on behalf of the Corporation, to take
> such action and to incur such expenses as is or may be reasonably necessary in connection
> with the consummation of the transaction[.]

(*See* D.I. 4 at p. 1027). As the primary secured lender to both UE and CH, CapSource's approval

was essential because the planned merger would require each company's debt to be restructured.

CapSource initially appeared to be in support of the merger, and numerous term sheets were

exchanged among the parties and CapSource in late July and early August. (*See* D.I. 7 at pp. 127-

29; 135-37 (Schuppe deposition); 151 (July 30, 2010 email from CapSource to Tousignant and

Peter Estler, CH's CEO, containing draft term sheet for "the consolidation, extension and long term

renewal" of both companies' existing credit facilities); 159 (Aug. 2, 2010 email from CapSource to

Tousignant, Estler, and others containing updated draft term sheet); 168 (Aug. 4, 2010 email from

CapSource to Tousignant and Alex Preiser at CH containing another revised term sheet). The

parties were in the thick of negotiating the merger as August 6 approached.

In late July 2010, the Board became aware that UE had insufficient cash to meet payroll and

other urgent obligations due by August 6. (*See* D.I. 7 at pp. 83-84). Tousignant initially

approached CapSource for funds to support UE until the merger closed, but CapSource refused.

Tousignant also sought a cash advance from CH, which CH agreed to, but only if the loan was

asset-backed. UE thus entered into negotiations with CH to develop additional transactions that

4

would allow UE to meet its short-term obligations while the two companies continued their merger

discussions. The parties eventually agreed to the sale of one of UE's properties ("1600 Broadway")

to CH, but due to unanticipated sale closing costs, the proceeds from that sale were insufficient to

cover UE's cash shortfall. Even with the net proceeds from the sale of 1600 Broadway, UE was

still $115,000 short on its immediate operating cash needs, particularly payroll.

To cover that shortfall, Tousignant negotiated with CH to develop another transaction – the

Agreement – to cover the shortfall. On August 9, 2010, Tousignant, acting on behalf of UE,

executed the Agreement with CH. (*See* D.I. 4 at p. 806). The Agreement provided:

> WHEREAS, UE has requested that CH provide to UE the amount of ONE
> HUNDRED FIFTEEN THOUSAND DOLLARS (US $115,000) (the "Infusion") for the
> payment of certain operating expenses of UE and has offered to CH in exchange therefor,
> the covenants, assets, representations and agreements herein contained (the
> "Consideration").

(*Id.*) The Agreement provided that in exchange for the cash infusion, UE agreed to use its best

efforts to: (1) negotiate with CapSource for the sale of a certain CapSource-financed Maui property

to CH, (2) secure an assignment and extension of leases on two other Maui properties, and (3)

transfer 30 members (900 member nights) to carry the costs of the leases. (*See id.* at pp. 806-07).

At the center of this dispute, Trustee contends that the paragraph of the Agreement in which UE

agreed to use its best efforts to transfer 30 UE members essentially transferred all of UE's

Membership Information to CH. The paragraph at issue states as follows:

> 900 NIGHTS — 30 FTE Membership Transfers. UE agrees that it shall work in good
> faith and provide its best efforts to contact and work with current members of UE
> Clubs (Premier, Signature, and Elite) in order to encourage members to transfer their
> respective memberships to CH immediately. Further, UE shall work with and
> provide its best efforts to CH to allow employees and representatives of CH to gain
> access to members of UE such that they may be informed as to the specific terms of
> CH membership. . . . UE agrees to provide its best efforts with regard to as many
> members as possible until such a time as membership nights, in aggregate, of no less
> than nine hundred (900) per annum have been agreed to by members transferring
> into CH memberships from UE. **UE hereby knowingly and voluntarily waives
> any restrictions contained in the [Confidentiality Agreement] and LOI that may
> be construed as limiting or inconsistent with the rights of CH under this**

**Section. . . . UE shall in no way or manner hold CH liable for any actions with respect to the direct solicitation of its members as set forth herein** and CH reserves the right to accept any number of member nights either over or above the nine hundred (900) set forth above in its sole and absolute discretion.

(*See id.* at p. 807, § 1.3 (emphasis added)).

The Agreement was negotiated between Tousignant and Pete Estler, CH's CEO, over the weekend of August 6 through August 8. At 7:09 p.m. on Friday, August 6, 2010, Estler emailed Tousignant a draft of the Agreement. Estler's accompanying email stated:

> Jim,
> The following agreement basically says we will provide $115,000 for you to provide best efforts to provide us the following 3 [sic] things:
> 1.    Work with CapSource to sell Maui to us
> 2.    Use best efforts to transfer 2 Maui leases to us
> 3.    Work with us to transfer 10 member [sic] per home to help us carry cost
> 4.    We both agree to waive non solicit and non compete
> The $115,000 will approximately (the final number is still moving around . . . We just got another $500 bill from a HVAC contractor) provide the total to cover payroll as requested. Pete

(*See* D.I. 7 at pp. 192-96). Discussion regarding close of the 1600 Broadway sale and the potential merger continued throughout the weekend, as UE's leadership struggled to keep the company afloat in the short term and figure out a comprehensive solution for the long term. (*See* D.I. 4 at pp. 1030, 1039; D.I. 7 at pp. 200-13). On Saturday, August 7, Tousignant spent the day interviewing restructuring consultants. Although UE was hopeful about the merger with CH, UE was also exploring the prospect of a standalone financing or reorganization. CRG Partners was ultimately selected as UE's restructuring consultant (*see* D.I. 7 at p. 274), but did not begin working with UE until the week of August 9.

Email communications continued among the parties on the morning of Sunday, August 8 concerning closing the 1600 Broadway sale, the Maui leases, and the potential merger. (*See id.* at pp. 223-25). At 2:44 p.m. that day, Estler emailed a revised version of the Agreement to Tousignant. (*See id.* at p. 226). At 7:04 p.m., UE's general counsel Jeff Sparks requested a copy

(D.I. 4 at p. 819), and Tousignant forwarded the latest version of the Agreement to Sparks at 7:18

p.m. (*See* D.I. 7 at p. 226).  Sparks expressed some concerns about the Agreement, and Tousignant

responded and requested a redline version at 2:11 a.m. on August 9. (*See* D.I. 4 at p. 1079).  The

record reflects that no redline of the document was emailed or provided when Sparks met with

Tousignant at UE's office the following morning.  At 8:30 a.m. on Monday, August 9, 2010, Sparks

and Tousignant had a call with CapSource and made one last request for funding, which was

denied.[1] (*See id.* at pp. 604-05, 608-09).  Thereafter, Tousignant executed the Agreement on behalf

of UE.  While Sparks and Tousignant were at UE's office in Florida on Monday, Keith was at CH's

office in Colorado for the closing of the 1600 Broadway sale.  Once both transactions closed,

money flowed from CH to UE, and payroll checks were issued to employees the afternoon of

Monday, August 9.

In late August, CRG began marketing the company.  By mid-September, the prospects of a

merger with CH had dimmed.  On September 14, 2010, a CRG representative accidentally sent an

email to CH that discussed potential bidders for UE's assets.  On September 16, 2010, presumably

alerted that the merger prospects had dimmed, CH began mass soliciting UE's members to switch

over to CH. (*See id.* at p. 1256).  Later that day, UE, through its outside counsel, sent a cease and

desist letter to CH. (*Id.* at p. 837).  CH responded with a letter on September 17, 2010, pointing to

the solicitation provision in the Agreement as justification for the solicitation. (*Id.* at p. 839).

On September 20 and 23, 2010, UE and various affiliates filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code, in part to stop the solicitation of its members.  On

September 21, 2010, UE filed a motion to reject the Agreement as an executory contract and

requested a temporary restraining order ("TRO") enjoining the solicitation of UE's members by

---

[1] The Trustee objects to this finding of fact. (*See* D.I. 2 at p. 5).  As set forth herein, the Court
overrules Trustee's objection.

CH. (*See In re Ultimate Escapes Holdings, LLC, et al.*, No. 10-12915-BLS (Bankr. D. Del.), D.I.

(hereinafter "B.D.I.") 17, 22). The Bankruptcy Court entered an order granting the motion to reject

on October 7, 2010, but it denied the request for TRO on the basis that UE was not likely to succeed

on the merits. (*See* D.I. 4 at 1016-18; B.D.I. 126). On December 8, 2011, the Bankruptcy Court

confirmed UE's chapter 11 liquidating plan. (*See* B.D.I. 935). The plan approved the transfer of

UE's assets to a liquidating trust and authorized Trustee to pursue causes of action on behalf of the

liquidating trust. On September 19, 2012, Trustee filed the complaint against Defendants.

## II.    CONTENTIONS

The complaint alleges that Defendants breached their fiduciary duties of loyalty and care by

entering the Agreement on behalf of UE. Trustee alleges that the Agreement "lifted any restrictions

that the [Confidentiality Agreement] and LOI placed on [CH's] use of the highly confidential

Membership Information," and essentially transferred UE's Membership Information, a multi-

million dollar asset, to CH, a direct competitor, for a mere $115,000. (*See* D.I. 7 at pp. 348, ¶ 95;

354, ¶ 128(a)). Trustee alleges that Defendants' acts and omissions were motivated in part by their

personal financial exposure arising from their advances and guarantees on UE's mortgage

obligations. (*Id.* at p. 344, ¶¶ 75-77; p. 354, ¶ 128(e)). To the extent that Defendants did not know

of the Agreement or its relevant provisions, Trustee asserts Defendants breached their fiduciary

duties by "failing to adequately inform themselves of the provisions of the Agreement" and "failing

to prudently manage [UE's] business operations and engaging in gross negligence in connection

thereto." (*Id.* at p. 354, ¶¶ 128(c), (f)). Trustee contends that Defendants traded UE's most valuable

asset for a de minimis cash infusion under the Agreement, which "caused or contributed to the filing

of the chapter 11 bankruptcy by [UE]" and "prohibited [UE] from conducting a full marketing

process in order to maximize value for all creditors via a sale of substantially all of [UE's] assets

pursuant to section 363 of the Bankruptcy Code." (*Id.* at p. 355, ¶¶ 132-33). Trustee alleges that as

a result of these breaches of fiduciary duties by Defendants, UE and its creditor constituencies sustained significant damages. (*Id.* at p. 355, ¶ 135).[2]

Tousignant argues that he acted in good faith and with undivided loyalty when he entered into the Agreement. Tousignant argues that the Agreement was not intended to lift all restrictions on CH's use of the Membership Information, but was intended only for the limited purpose of transferring approximately thirty UE members to CH. Tousignant argues that the decision to enter into the Agreement is protected by the business judgment rule. Tousignant argues that the Agreement provided UE with critical financing in the face of an otherwise imminent bankruptcy filing and thus the decision can be attributed to a rational business purpose. While Defendant Keith concedes that he was generally aware of how UE was going to cover its $115,000 shortfall, he contends that his direct role was limited to closing the 1600 Broadway sale. Keith argues that Trustee presented no direct evidence to support Keith's knowledge of and involvement in the negotiation and execution of the Agreement.

Following the trial, the Bankruptcy Court filed its Proposed Findings of Fact and Conclusions of Law Pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(a) ("FFCL") (D.I. 1). The Bankruptcy Court found that the Agreement only intended for the transfer of member information for the limited purpose of converting approximately thirty UE members to CH. (D.I. 1 at p. 2). The Bankruptcy Court found that Trustee had failed to articulate or prove facts sufficient to prove that Tousignant, in entering into the Agreement, had breached his duty of loyalty or duty of care and thus Trustee had not met the burden necessary to rebut the presumption that the business judgment rule applied. (*See id.* at pp. 19-26 (finding insufficient evidence to support a breach of the duty of loyalty); pp. 26-30 (finding insufficient evidence to

---

[2] The Complaint contained a second count against Keith for aiding and abetting breach of fiduciary duty, which was dismissed by the Bankruptcy Court by Order dated April 23, 2013.

support a breach of the duty of care). Having found that Tousignant's actions in negotiating and

executing the Agreement were protected by the business judgment rule, the Bankruptcy Court

further found that Tousignant's decision to enter into the Agreement was attributable to a rational

business purpose. (*See id.* at p. 31). The Bankruptcy Court found no evidence that Keith had actual

knowledge of the terms of the Agreement and the record reflected that it was negotiated and

executed without his approval. (*See id.* at p. 32).

On March 12, 2015, Trustee filed his objections to the proposed FFCL (D.I. 2), along with

suggestions in support of his objections (D.I. 3). On April 2, 2015, Defendants filed their response

in opposition to the Objections (D.I. 6). The proposed FFCL are now properly before me to render

final judgment. The Bankruptcy Court recommends that I adopt its findings and conclusions and

hold that the business judgment rule applies and that Defendants did not breach their fiduciary

duties. (*See* D.I. 1 at p. 32). For the reasons set forth below, I adopt the proposed FFCL.

## III.    STANDARDS OF REVIEW

### A.    28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(d)

Once a bankruptcy court determines that a pending matter is not a core proceeding under 28

U.S.C. § 157(b)(2), but is nonetheless related to a case under title 11, it shall submit proposed

findings of fact and conclusions of law to the district court. *See* 28 U.S.C. § 157(c)(1). Thereafter,

"any final order or judgment shall be entered by the district court judge after considering the

bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to

which any party has timely and specifically objected." *Id.* The Federal Rules of Bankruptcy

Procedure provide that:

> The district judge shall make a de novo review upon the record or, after additional
> evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of
> law to which specific written objection has been made in accordance with this rule.
> The district judge may accept, reject or modify the proposed findings of fact or
> conclusions of law, receive further evidence, or recommit the matter to the
> bankruptcy judge with instructions.

Fed. R. Bankr. P. 9033(d). "In conducting a de novo review, the Court must consider all of the Bankruptcy Court's findings and conclusions and afford them no presumption of validity." *In re Montgomery Ward & Co.*, 2004 WL 323095, at *1 (D. Del. Feb. 13, 2004), *rev'd on other grounds*, 428 F.3d 154 (3d Cir. 2005).[3]

### B. Breach of Fiduciary Duty Claims

These claims arise under Delaware law. *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (holding that state of incorporation is the appropriate state to regulate corporation's internal affairs, including fiduciary relationships between or among corporation and its directors, officers, and shareholders). A director's breach of fiduciary duty constitutes a matter of corporate internal affairs appropriate for regulation under governing state law. *See, e.g., In re Topps Co. S'holder Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007). Here, UE is a Delaware corporation, and Defendants served as directors of UE. Tousignant was also an officer. Thus, Delaware law must be applied to the claims asserted in the complaint.

Breach of fiduciary duty claims are evaluated under well-established standards of review and conduct. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013). "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct. It describes what a plaintiff must first plead and later prove to prevail." *Id.* at 35-36. Under Delaware law, the standard of review depends initially on

---

[3] Trustee states that "it is objecting to the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law in their entirety." (*See* D.I. 2 at p. 1). Federal Rule 9033 requires my de novo review of "findings of fact or conclusions of law to which **specific** objection has been made . . ." Fed. R. Bankr. P. 9033 (emphasis added). This Memorandum Opinion will therefore address the Trustee's thirty specific objections to the Bankruptcy Court's proposed FFCL. In my opinion, any unspecified objections are waived.

whether the corporate fiduciaries (1) were disinterested and independent (the business judgment

rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in a

particular recurring and recognizable situation (enhanced scrutiny), or (iii) confronted actual

conflicts of interest such that the directors making the decision did not comprise a disinterested and

independent board majority (entire fairness). *See id.* at 36.

"Delaware's default standard of review is the business judgment rule." *Id.* at 43 (internal

quotations omitted). Under the business judgment rule, a court will not second-guess the

fiduciary's decision as long as it has any rational business purpose, even if the decision ends up

being flawed in hindsight. *See In re Dollar Thrifty S'holders Litig.*, 14 A.3d 583, 598 (Del. Ch.

2010); *Kahn v. Roberts*, 1995 WL 745056, *4 (Del. Ch. 1995). "The business judgment rule is not

actually a substantive rule of law, but instead it is a presumption that in making a business decision

the directors of a corporation acted on an informed basis and in the honest belief that the action

taken was in the best interests of the company [and its shareholders]." *In re Walt Disney Co.*

*Derivative Litig.*, 907 A.2d 693, 746-47 (2005) ("*Walt Disney I*") (internal quotation marks and

citations omitted). "This presumption applies when there is no evidence of fraud, bad faith, or self-

dealing in the usual sense of personal profit or betterment on the part of the directors." *Id.* at 747

(internal quotation marks and citations omitted). When a plaintiff fails to rebut the presumption of

the business judgment rule, the plaintiff is not entitled to any remedy, be it legal or equitable, unless

the transaction constitutes waste. *Id.* (citing *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542

A.2d 770, 780 (Del. Ch. 1988)).

Under the business judgment rule, the burden is on the party challenging the decision to

establish facts rebutting the presumption. *Orman v. Cullman*, 794 A.2d 5, 20 (Del. Ch. 2002)

(citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). To rebut the business judgment

presumption, the party challenging the transaction must present evidence "to demonstrate by a

preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste." *Walt Disney*, 907 A.2d at 756. "More specifically, in the area of director action [as opposed to inaction], plaintiffs must prove by a preponderance of the evidence that the presumption of the business judgment rule does not apply either because the directors breached their fiduciary duties, acted in bad faith or that the directors made an unintelligent or unadvised judgment, by failing to inform themselves of all material information reasonably available to them before making a business decision." *Id.* (internal quotation marks and citations omitted). If plaintiff succeeds in rebutting the presumption, the burden shifts to the defendants to prove by a preponderance of the evidence that the challenged transaction was "entirely fair" to the corporation and its shareholders. *Id.* at 757. Unless one of its elements is rebutted, the business judgment rule applies, and "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *Trados*, 73 A.3d at 43 (quoting *Dollar Thrifty*, 14 A.3d at 598). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty. *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

## IV.   DISCUSSION

### Objections 1-2: Determination of Standard of Review

Trustee objects on the basis that the Bankruptcy Court "incorrectly decided whether Tousignant and Keith breached their fiduciary duties of loyalty and care *before* determining what standard of review to apply." (*See* D.I. 3 at pp. 11-12; *see also* D.I. 2 at p. 2). Trustee argues that the Bankruptcy Court "inverted the legal analysis and put the cart before the horse" in failing to determine the appropriate standard of review before determining whether Defendants met their standard of conduct. (*See* D.I. 3 at p. 11). Trustee argues that "Delaware law is clear that the Court is to make a threshold determination of the standard of review to which the facts of the case are to

13

be viewed." (*See id.* at p. 2). Trustee further states "Delaware courts have repeatedly held that the standard of review is a 'threshold' or '*ab initio*' question for the purpose of determin[ing] the 'lens' through which the facts are viewed." (*See id.* at p. 16).

As noted above, the business judgment rule is Delaware's default standard of review. *See Trados*, 73 A.3d at 43. To rebut the presumption, it is Trustee's burden to demonstrate by a preponderance of the evidence that Defendants violated their fiduciary duties and/or committed waste. *See Walt Disney*, 907 A.2d at 756. In determining that the business judgment rule applied to the Agreement, the Bankruptcy Court carefully considered the evidence adduced by Trustee in support of his allegations that Defendants breached their fiduciary duties and found that Trustee did not carry his evidentiary burden to rebut the presumption. Trustee appears to argue, however, that it was improper for the Bankruptcy Court to engage in any analysis of the facts adduced by Trustee in support of his breach of fiduciary duty claims prior to determining the correct standard of review. (*See* D.I. 3 at pp. 2, 12.) This objection forms the basis of Trustee's further objections that entire fairness review should have been applied *ab initio* based on evidence of Defendants' lack of disinterestedness and independence. (*See* D.I. 3 at pp. 12-13 (standard of review must be determined *ab initio*); D.I. 2 at pp. 4-6 (arguing entire fairness review triggered *ab initio* because (i) the Agreement conferred unique benefit on Defendants not shared by stakeholders generally; (ii) Defendants perceived it would lessen the chance that a legal action would be brought against them; and (iii) Defendants were driven to preserve their jobs, compensation, and titles). Alternatively, Trustee argues that enhanced scrutiny should have applied *ab initio* based on evidence that a fundamental change of corporate control occurred or was contemplated by the Agreement. (*See* D.I. 2 at p. 7; D.I. 3 at p. 31). Trustee cites two cases – *Walt Disney II* and *Trados* – in support of his contention that the Bankruptcy Court was required to determine the standard of review *ab initio*, as a threshold matter, before considering evidence supporting the breach of fiduciary duty claims

14

against Defendants. (*See* D.I. 3 at p. 12 (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52-53 (Del. 2006) ("*Walt Disney II*") and *Trados*, 73 A.3d at 21)).

Defendants argue that there is no requirement under Delaware law that a threshold determination of the standard or review must be made before the court may engage in any analysis of the conduct which allegedly violated a fiduciary duty, and that neither *Walt Disney II* nor *Trados* stand for such a rule. (*See* D.I. 6 at p. 3). Defendants argue that not only is such an *ab initio* determination not required under Delaware law, but such a determination would be impossible in most cases because the key trigger for a heightened level of scrutiny is director interest, which often cannot be determined on the face of the challenged conduct or transaction. (*See id.*) Defendants argue that the Bankruptcy Court simply could not have been required, as argued by Trustee, to blindly accept Trustee's assertion that Defendants suffered actual or potential conflicts of interest, and apply a heightened standard of scrutiny to Defendants' conduct *ab initio*, without analyzing whether the record supported the Trustee's assertion. (*See id.* at p. 4).

Despite Trustee's reliance on the *Walt Disney II* case, I find the Bankruptcy Court's analysis is in accordance with the analysis conducted by the Court of Chancery in *Walt Disney I* and upheld by the Delaware Supreme Court in *Walt Disney II*. At the outset of its analysis, the Court of Chancery noted:

> Plaintiffs must now rely on the evidence presented at trial to demonstrate by a preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste. More specifically, in the area of director action, plaintiffs must prove by a preponderance of the evidence that the presumption of the business judgment rule does not apply either because the directors breached their fiduciary duties, acted in bad faith or that the directors made an unintelligent or unadvised judgment by failing to inform themselves of all material information reasonably available to them before making a business decision... If plaintiffs cannot rebut the presumption of the business judgment rule, the defendants will prevail.

*Walt Disney I*, 907 A.2d at 756 (internal citations and quotations omitted). In determining whether plaintiffs had rebutted the business judgment presumption, the Court of Chancery carefully

considered evidence of defendants' conduct presented at trial, including whether various defendants participated in the decisions at issue (*see id.* at 757 (finding defendant did not play a part in decision at issue and thus did not breach fiduciary duty of loyalty)); whether defendants committed waste (*see id.* at 759 (finding "record does not support those assertions in any conceivable way")); and whether the decision at issue was a violation of the duty of care (*i.e.*, grossly negligent) or made in bad faith (*see id.* at 760-79 (finding no evidence of gross negligence or bad faith)). Finding that plaintiffs had failed to demonstrate by a preponderance of the evidence a breach of fiduciary duty or corporate waste, the Court of Chancery found that the business judgment presumption was not rebutted and entered judgment for the defendants. *See id.* at 779. Thus, the Court of Chancery's determination of the standard of review necessarily included a consideration of whether the evidence supported a finding of breach of fiduciary duty.

In their appeal to the Delaware Supreme Court, appellants in *Walt Disney II* argued that the Court of Chancery erred by (i) failing to make a "threshold determination" of the violation of the duty of care in the form of gross negligence, and (ii) conflating the appellants' burden to rebut the business judgment presumption with an analysis of whether the directors' conduct fell within Delaware's statute precluding exculpation of directors for monetary liability "for acts or omissions not in good faith." *See Walt Disney II*, 906 A.2d at 53. The Delaware Supreme Court found no merit in appellants' argument. *See id.* (noting appellants' argument ignores distinction between (i) determination of bad faith for the "threshold purpose" of rebutting business judgment rule presumptions and (ii) bad faith determination for purposes of evaluating availability of a charter-authorized exculpation, and that Delaware law "clearly permits a judicial assessment of director good faith for the former purpose [of rebutting the business judgment rule])." *Id.* While *Walt Disney II* may refer to the Court of Chancery's determination of bad faith as having been made for a "threshold purpose," that threshold purpose was not an *ab initio* determination of the standard of

review, but rather "rebutting the business judgment rule." *See id.* Thus, *Walt Disney II* does not preclude consideration of evidence of breach of fiduciary duty for the purpose of determining whether the business judgment rule has been rebutted, nor does it set any other parameters for what evidence may be considered in determining the correct standard of review. *Walt Disney II* provides no support for Trustee's argument that the Bankruptcy Court was required to make a determination of the standard of review *ab initio* before considering evidence of alleged breach.

Trustee also cites *Trados* in support of the contention that "the threshold inquiry into the standard of review is an *ab initio* question." (*See* D.I. 3 at p. 12 (citing *Trados*, 73 A.3d at 21)). However, in *Trados*, the Court of Chancery simply noted that, in that particular case, entire fairness review did not apply *ab initio* (although it was ultimately chosen as the appropriate standard of review). *See Trados* 73 A.3d at 21. The Court of Chancery went on to say that because entire fairness did not apply to that particular case *ab initio*, the burden of proof rested on the plaintiff to adduce evidence to rebut the presumption. *Id.* Much like the Bankruptcy Court here, before reaching the conclusion that entire fairness was the correct standard of review, the Court of Chancery carefully considered the evidence adduced by plaintiff to show that defendants were not independent and disinterested. *See id.* at 45-55 (considering evidence of whether defendants received personal benefits). It is difficult to see how *Trados* supports Trustee's objection simply because the court found a higher standard of review did not apply, in that particular case, "*ab initio.*"

The Delaware Supreme Court and Court of Chancery have certainly had occasion to find that certain transactions, on their face, warranted application of a higher standard of review *ab initio* and without further analysis. "The category of transactions that require judicial review pursuant to the entire fairness standard *ab initio* do so because, by definition, the inherently interested nature of those transactions [is] inextricably intertwined with issues of loyalty." *Emerald Partners v. Berlin,*

787 A.2d 85, 93 (Del. 2001); *see also, Emerald Partners v. Berlin*, 726 A.2d 1215, 1222 (Del. 1999) (holding complaint "made a sufficient showing through factual allegations that entire fairness should be the standard by which the directors' actions are reviewed" at trial); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *30 (Del. Ch. May 3, 2004) ("Both sides agree that because the [transaction] is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio*"); *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 2014 WL 4418169, *5 (Del. Ch. Sept. 10, 2014), *rev'd on other grounds*, 115 A.2d 1173 (Del. 2015) (transaction was subject to entire fairness review *ab initio* because controlling stockholder stood on both sides of the transaction and because complaint adequately alleged that merger was not entirely fair to the minority).

However, unlike cases where a director defendant stands on both sides of a transaction, the Agreement at issue in this case is not of an "inherently interested nature" such that enhanced scrutiny or entire fairness review could have been determined as the appropriate standard of review *ab initio*. Here, a heightened standard of review was simply not warranted on the face of the transaction, and the Bankruptcy Court was required to consider the evidence adduced by Trustee to rebut the business judgment presumption. The Bankruptcy Court could not have determined whether Defendants' conduct in entering the Agreement was subject to heightened scrutiny without first determining whether Defendants were disinterested and independent. Absent this analysis, the Bankruptcy Court would be blindly accepting Trustee's assertion that Defendants were interested in the transaction without analyzing whether the record supported the Trustee's assertion.

Neither *Walt Disney II* nor *Trados* stand for the rule that a threshold or *ab initio* determination of the standard of review must be made before a court may engage in any analysis of the conduct which allegedly violated a fiduciary duty. While the nature of certain transactions may dictate heightened scrutiny *ab initio*, such a determination was not possible with respect to the

Agreement. I conclude that the Bankruptcy Court's analysis was entirely consistent with Delaware law.

The Bankruptcy Court looked first to the evidence adduced by Trustee to support a finding of breach of the duty of loyalty. (*See* D.I. 1 at pp. 20-22 (finding Tousignant did not receive a personal benefit from the transaction not equally shared by the stockholders upon entering the Agreement; finding "no evidence" that Tousignant's decision to enter the Agreement was based on extraneous considerations or influences or that Tousignant acted with a purpose other than that of advancing the best interests of the corporation; finding "no evidence" Tousignant's actions were driven by naked self-preservation; and finding "no evidence" Tousignant was on both sides of the transaction)). Having determined that Defendants were not interested in the Agreement such that entire fairness was required, the Bankruptcy Court considered whether the nature of the Agreement was such that enhanced scrutiny should be applied. (*See id.* at 23-24). After considering evidence adduced by the Trustee in support of his argument, the Bankruptcy Court concluded that the Agreement did not effectuate a change of control, was not a merger agreement, a final stage transaction or any of the specific, recurring, and readily identifiable situations in which courts apply enhanced scrutiny. (*See id.* at pp. 23-24). Despite finding that the nature of the Agreement did not warrant enhanced scrutiny, the Bankruptcy Court went on to consider Trustee's argument that Defendants committed corporate waste by entering the Agreement. (*See id.* at 24). The Delaware Supreme Court has clarified that good faith is no longer a separate fiduciary duty but rather a subsidiary element or condition of the duty of loyalty. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). As committing waste is an act of bad faith (*see White v. Panic*, 783 A.2d 543, 553-55 (Del. 2001) (implicit holding)), the Bankruptcy Court's consideration of the Trustee's waste argument in connection with the duty of loyalty allegations was appropriate. (*See* D.I. 1 at 24). Finally, the Bankruptcy Court considered the evidence presented by Trustee to

19

demonstrate a breach of the duty of care. (*See id.* at pp. 26-30 (finding that the "record is clear that all parties worked diligently over the course of multiple months to close the merger transaction"; finding Trustee's argument that Tousignant did not adequately inform himself of the substance of the Agreement was "contradicted by the record"; and finding "the record is clear" that Tousignant pursued other alternatives, was in constant contact with UE's officers and directors, pursued the transaction in light of all material information reasonably available, and acted with the honest belief that the Agreement was the only means to provide the necessary cash infusion)).

After a thorough consideration of facts cited by Trustee to rebut the business judgment presumption, the Bankruptcy Court found that evidence presented was not sufficient to support a finding of a breach of fiduciary duty such that the burden could be shifted to Defendants to show the fairness of the transaction. (*See id.* at pp. 25, 30).[4] Having found that Trustee failed to carry his evidentiary burden, the Bankruptcy Court determined that the business judgment standard should apply. (*Id.* at p. 30). The Bankruptcy Court then turned to its substantive analysis in applying the business judgment rule to the challenged conduct. (*See id.* at pp. 30-31). In applying the business judgment rule to Tousignant's decision to enter into the Agreement, the Bankruptcy Court

---

[4] The Bankruptcy Court stated: "In order to defeat the presumption that the business judgment rule applies, the Trustee must point to 'sufficient facts to support a reasonable inference' that the decision to enter into the [Agreement] was a breach of Tousignant's duty of loyalty or duty of care." (*See* D.I. 1 at 18 (citing *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 562 (Bankr. D. Del. 2012)). However, in *Autobacs*, the Bankruptcy Court considered the evidence of breach of fiduciary duty in the context of a motion to dismiss. *See Autobacs*, 473 B.R. at 562 (citing *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (considering motion to dismiss) and *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, *7 (Del.Ch. 2007) (same)). Delaware courts have held that preponderance of the evidence is the correct standard. *See Walt Disney I*, 907 A.2d at 756 ("To rebut the business judgment presumption, the party challenging the transaction must present evidence to demonstrate by a preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste.") (internal citations omitted) (emphasis added)). However, because the Bankruptcy Court found insufficient evidence of breach of fiduciary duty, even under the lower standard applied to a motion to dismiss, any error had no impact on the outcome.

considered whether the decision could be "attributed to any rational business purpose" or whether it was "so blatantly imprudent that it was inexplicable." (*See id.* at p. 31). Following a three-day trial, the Bankruptcy Court found that Tousignant's decision to enter the Agreement was attributable to a rational business purpose. (*See id.*) For the reasons set forth above, I find that the Bankruptcy Court properly determined the standard of review before determining whether the standard of conduct was met, and that the Bankruptcy Court's analysis was consistent with Delaware law. [5]

### Objections 3-4: Authority to Enter the Agreement

Trustee contends that Tousignant breached his duty of care because he was grossly negligent in failing to adequately inform himself of the Agreement's provisions, failing to seek the advice or approval of the Outside Directors prior to entering the Agreement, and failing to prudently manage UE's business operations. (*See* D.I. 7 at p. 354, ¶ 128). Trustee therefore objects to the Bankruptcy Court's findings regarding Tousignant's authority to enter the Agreement. (*See* D.I. 2 at p. 2). Trustee objects to the following finding: "As a baseline the Court notes that Tousignant was vested with authority to operate the business generally." (*See* D.I. 1 at p. 26). In support of his objection,

---

[5] Apart from *Walt Disney II* and *Trados*, Trustee's argument that the Bankruptcy Court's legal analysis was improper relies solely upon the order and wording of the Bankruptcy Court's subheadings. Specifically, Trustee cites the following subheadings in his Objection: "2. The Evidence Does Not Support a Breach of The Duty of Loyalty" and "3. The Evidence Does Not Support a Duty of Care Violation", and "4. Tousignant Is Entitled to the Protections of the Business Judgment Rule." (*See* D.I. 2 at p. 1). Notwithstanding Trustee's misplaced emphasis on mere subheadings, it is clear that the Bankruptcy Court properly began its analysis with a careful consideration of the evidence adduced by Trustee and whether that evidence was sufficient to demonstrate a breach of any fiduciary duty such that the business judgment rule was rebutted. Trustee further cites to the following sentence in support of the objection: "Having disposed of the Trustee's argument that Tousignant breached his duties of loyalty and care, the Court must now apply the business judgment rule to the challenged conduct." (*See id.* at pp. 1-2). This transitional sentence does not undermine the Bankruptcy Court's analysis, as it is clear that all the Bankruptcy Court "disposed of" in its prior analysis was whether the evidence offered by Trustee was sufficient to carry Trustee's burden of demonstrating a breach of fiduciary duty such that the business judgment presumption was rebutted.

Trustee argues that "[t]he authority to conduct the business and affairs of a corporation is vested

with the board of directors." (*See* D.I. 2 at p. 2; D.I. 3 at p. 13 (citing *Trados*, 73 A.3d at 36)). This

argument is of no moment, however, because the Bankruptcy Court further found that Tousignant

was granted authority by the Board at the June 10, 2010 Board meeting. (*See* D.I. 1 at p. 26).

The Bankruptcy Court found that Tousignant "had authority – either apparent or actual – to

enter into the Agreement as [UE's] board of directors 'authorized and empowered' him in June

2010 'to take such actions and to incur such expenses as is or may be reasonably necessary in

connection with the consummation of the [CH merger] transaction.' With this authority, the record

is clear that all parties worked diligently over the course of multiple months to close the merger

transaction." (*See id.*; *see also* D.I. 4 at p. 1027 (minutes of June 10, 2010 Board meeting)).

Trustee argues that the Board resolutions only authorized Tousignant to incur such expenses and

take such actions as reasonably necessary to close the contribution agreement. (*See* D.I. 3 at pp. 14-

15 (citing D.I. 4 at pp. 1027)). However, the contribution agreement embodied the merger, and the

Board resolutions clearly authorized Tousignant to take actions "reasonably necessary in connection

with the consummation of the [Project Bond merger] transaction." (*See* D.I. 4 at p. 1027).

Granting Tousignant authority to take actions necessary to consummate the merger is not

inconsistent with the concept that authority to conduct the business and affairs of a corporation is

vested with the board of directors. *See Trados*, 73 A.3d at 36. The CH merger comprised the

business and affairs of UE, and the decision to pursue the merger, and take such actions reasonably

necessary in connection with the consummation of the merger, was made under the direction of

UE's Board. This is supported by the resolutions adopted by the Board on June 10, 2010 and also

by witness testimony. As noted by the Bankruptcy Court, the record is clear that "[UE's] Outside

Directors and counsel believed that the best result for all stakeholders, including shareholders, was

to continue along the path to a Club Holdings merger." (*See* D.I. 1 at p. 21 (citing testimony of

Sparks (D.I. 7 at pp. 98-99); Frantz (*id.* at pp. 178-79); and McMillen (*id.* at pp. 120))). The

Bankruptcy Court further found that "Tousignant's decision to enter into the Agreement was simply

an act in furtherance of this transaction, seen at that moment, as the best possible outcome for the

company." (*See* D.I. 1 at p. 21).

     The record also belies the argument that the Agreement was a transaction that typically

required Board approval. In addressing whether Board approval was necessary prior to entering

into the Agreement, the Bankruptcy Court found relevant Tousignant's view, as he testified at trial,

that the company "had a very strict practice typically governed by our counsel and financial

executives as to whether in any given case [a transaction] required shareholder approval, board

approval. And in this particular case, it was clearly in our minds something that was a fairly

straight-forward agreement and didn't require any notice, any approvals of any of those parties."

(*See id.* at pp. 28-29; *see also* D.I. 4 at p. 591 (Tousignant's testimony, regarding whether he sent a

draft of the Agreement to the Outside Directors, that "[i]t normally would not have been my

practice ... [W]e were in the real estate business. We did, probably in a given year, 50 to 100

transactions, in terms of the purchase and sale of real estate, the leasing and re-leasing of real estate.

And often, it was either Bill [Callaghan] or Jeff Sparks, who would, depending on the nature of the

transaction, determine who would and did get copies of drafts."). "This view is supported by an

email from the company's general counsel Jeff Sparks to Tousignant in which Sparks noted that

signing the agreement 'didn't fall within the approval authority for the Board.'" (*See* D.I. 1 at 29;

D.I. 7 at p. 420 (Sept. 1, 2010 email from Sparks to Tousignant in response to question from

Tousignant as to whether Sparks circulated the Agreement to the full board)). I agree "[t]he record

belies the Trustee's allegations that board approval was necessary prior to entering into the

[Agreement]." (*Id.* at p. 29). For the foregoing reasons, I agree with the Bankruptcy Court that the

evidence did not support a finding of a violation of the duty of care based on a lack of authority to enter into the Agreement.[6]

### Objections 5-7: Defendant Keith's Knowledge and Participation

The Bankruptcy Court found that: "As to Mr. Keith, the Court finds that there is no evidence he had actual knowledge of the terms of the [Agreement] as he did not sign the agreement and the record reflects that it was negotiated and executed without his or full board approval." (*See* D.I. 1 at p. 18).

Upon review of the record, I find no evidence in the record to contradict this finding. The Agreement was drafted by CH and was emailed to Tousignant on Friday evening, August 6. (*See* D.I. 7 at p. 192-96). Tousignant shared it with Phil Callaghan, UE's CFO, and Jeff Sparks, UE's general counsel, on Sunday, August 8. (*See* D.I. 4 at p. 1079; D.I. 7 at p. 226). After communications between Tousignant and Sparks on Monday, August 9 (*see id.* at p. 1079), Sparks emailed a copy of the Agreement, signed by Tousignant, to CH. (*See* D.I. 7 at p. 436). There is no direct evidence in the record that the Agreement was circulated to Keith or anyone else on the Board prior to its execution, other than Callaghan and Sparks. (*See id.* at p. 420 (email from Sparks to Tousignant noting that the Agreement was not circulated because it "didn't fall within the approval authority of the board")). Moreover, Keith testified that he neither saw the Agreement nor learned of its specific language until after the mass solicitation by CH. (*See* D.I. 4 at p. 530; D.I. 7 at p. 442).

---

[6] Trustee also objects to the Bankruptcy Court's conclusion that Tousignant had apparent authority to enter the Agreement (*See* D.I. 2 at p. 2). Trustee objects to this finding on the basis that the concept of apparent authority "only applies to bind a corporation *by a third-party* who relied on the appearance that an officer had authority to bind the corporation." (*See* D.I. 3 at p. 14, n.10 (emphasis in original)). Because I adopt the Bankruptcy Court's finding that Tousignant had actual authority to enter into the Agreement based the Board's June 10, 2010 resolutions, I do not address the Bankruptcy Court's conclusion that Tousignant had apparent authority to enter into the Agreement.

Absent direct evidence, Trustee relies on circumstantial evidence of Keith's knowledge of the specific provisions of the Agreement. Trustee cites Tousignant's testimony that he "absolutely" told Keith about the Agreement, and that Keith was "very aware" of the Agreement's terms. (*See* D.I. 2 at p. 3; D.I. 3 at p. 18 (citing D.I. 4 at p. 614)). Because Keith conceded that he was "generally aware of how [UE] was going to cover its $115,000 shortfall" and that he participated in considering alternatives to the Agreement, Trustee argues that Keith has "admit[ted] his own contemporaneous knowledge of the Agreement." (*See* D.I. 3 at p. 18). I am not persuaded this testimony supports a finding of Keith's knowledge of the specific terms of the Agreement. Rather, the cited testimony confirms that Keith, along with the rest of the Board, was generally aware that the shortfall was being made up by UE's agreement to use its best efforts to cause the assignment of two Maui home leases, cause CapSource to approve the sale of a third Maui property, and assist in causing the transfer of a limited number of UE's members necessary to carry the costs of the Maui properties. (*See* D.I. 4 at pp. 614-15).

In support of his contention that Keith participated in negotiating the Agreement and had knowledge of the specifics of the Agreement, Trustee further cites Keith's prior relationship with CH CEO Estler and argues that Keith was in regular contact with Estler as part of a "tag team approach" with Tousignant. (*See* D.I. 3 at pp. 18-19; D.I. 4 at p. 477). Trustee notes that on the morning of August 9, 2010, Keith personally picked up and exchanged legal documents at CH's outside counsel's office in Boulder, Colorado and then personally delivered legal documents to CH's office in Broomfield, Colorado. (*See* D.I. 3 at p. 19). However, the record supports a finding that those documents related to the 1600 Broadway sale transaction. (*See* D.I. 4 at pp. 518-28). To the extent that Trustee insinuates that Keith knowingly or unknowingly gave the Agreement signed by Tousignant to CH on August 9 (*see* D.I. 3 at p. 19), that was specifically denied by Keith. (*See*

D.I. 7 at pp. 441-42 ("I can tell you what was not in there [the documents delivered to CH]. That

[August 6 Agreement] was not in there.")).

In absence of evidence that Keith had knowledge of the specifics terms of the Agreement or

that it was executed with his approval, I find no error with the Bankruptcy Court's proposed

finding. Because Keith had no actual knowledge of the specific provision of the Agreement that

Trustee contends gave CH the right to mass solicit UE's members, which is the foundation of

Trustee's complaint, there is no basis for finding that Keith breached a fiduciary duty.

### Objection 8: Keith's Interest in the Transaction

Trustee objects on the basis that the Bankruptcy Court "incorrectly ignored Keith's interests

when determining the standard of review." (*See* D.I. 3 at p. 20; *see also* D.I. 2 at p. 3). Trustee

argues that Keith had $12 to $14 million in personal guarantees on UE's owned properties and no

ability to pay off this debt. (*See* D.I. 3 at p. 20). The record also reflects that Keith also made two

mortgage payments on behalf of UE in the amount of $56,000 and $44,000, respectively. (*See* D.I.

4 at p. 461-62). Trustee cites Keith's testimony that he would be "better served, in a combined

company involving [CH], to dismantle the debt over time than to try to unwind it inside UE." (D.I.

4 at p. 785). Keith also testified at trial that "get[ting] out from under this debt" was part of his

desire to close a merger with CH. (*See id.* at p. 458). Thus, Trustee argues the Agreement, which

"was designed to lockup the merger with [CH]," conferred a unique benefit on Keith in the form of

a heightened potential to get out from under $12-$14 million in personal guarantees. (*See* D.I. 3 at

p. 21). Because shareholders did not share equally in this potential benefit, Trustee argues that

entire fairness should have applied as the standard of review. (*See id.*) Defendants argue that,

contrary to the position asserted by Trustee in his Objections, there is no evidence that contradicts

the Bankruptcy Court's findings. (*See* D.I. 6 at p. 40).

As set forth above, I adopt the Bankruptcy Court's finding that "there is no evidence that

Mr. Keith participated in or was aware of the specifics of the August 6th Agreement." (D.I. 1 at p.

2). Because Keith had no actual knowledge of the specific provisions of the Agreement that Trustee

contends gave CH the right to mass solicit UE's members, which is the foundation of Trustee's

complaint, Trustee's breach of fiduciary duty claims against Keith must fail. Therefore the

Bankruptcy Court did not "incorrectly ignore" Keith's interest in determining the appropriate

standard of review.

### Objections 9-12:  Personal Advances

Trustee contends that Tousignant was interested in the transaction and thus entire fairness

review was triggered. (*See* D.I. 2 at p. 4). Trustee therefore objects to the Bankruptcy Court's

findings that Tousignant "did not receive a personal benefit from [the Agreement] which was not

equally shared by the stockholders" and that there was "no evidence that Tousignant's decision was

based on extraneous considerations or influences." (*See* D.I. 1 at p. 21; D.I. 2 at p. 4).  In support

of his objections, Trustee cites evidence that Tousignant personally advanced $50,000 to CapSource

on behalf of UE. [7] (*See* D.I. 2 at p. 4; D.I. 4 at pp. 96, 463-64). Trustee also cites to email

communications and deposition testimony evidencing that Tousignant expected to be repaid his

personal advance through the CH merger. (*See* D.I. 3 at pp. 22-23 (citing D.I. 4 at pp. 101, 791,

798)). Because the Agreement was "designed to lockup the merger with [CH]," Trustee argues that

the Agreement conferred a unique benefit on Tousignant that was not shared by the stockholders

generally – namely the heightened chance of getting repaid his $50,000 personal advance – and thus

entire fairness review was triggered. (*See* D.I. 2 at 4; D.I. 3 at p. 23).

---

[7] Trustee's objections relating to the Bankruptcy Court's consideration of Tousignant's personal
guarantees are addressed separately below with respect to objections 19-21.

The duty of loyalty requires that a corporate fiduciary act with "undivided and unselfish loyalty to the corporation" and that "there shall be no conflict between duty and self-interest." *Weinberger v. UPO, Inc.*, 457 A.2d 701, 710 (Del. 1983) (citing *Guth v Loft, Inc.*, 5 A.2d 503, 510 (1939). As set forth by the Delaware Supreme Court in *Aronson*: "from the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *See Aronson*, 473 A.2d at 812. "[A] director is interested in a transaction if he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders .... for purposes of fiduciary review, the benefit received by the director and not shared with stockholders must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties ... without being influenced by her overriding personal interest." *Trados*, 73 A.3d at 45 (internal citations omitted).

I find no evidence that Tousignant stood on both sides of the Agreement or derived a personal financial benefit from the Agreement not shared by shareholders equally. I am not persuaded by Trustee's argument that the Agreement conferred a unique benefit upon Tousignant in the form of "a heightened chance of getting repaid" the personal advance. Under these facts, I do not find this constitutes a "personal financial benefit in the sense of self-dealing" that is sufficient to trigger entire fairness review under *Aronson*. The record reflects that multiple witnesses (including Trustee's own witnesses) rejected the proposition that Tousignant had personally profited or realized any pecuniary gain from the Agreement. (*See* D.I. 1 at p. 21 (citing depositions of Sparks (D.I. 7 at p. 105); Schuppe (*id.* at p. 150); Frantz (*id.* at p. 181); Wolf (*id.* at p. 391)); and Griessel (*id.* at p. 394). The Bankruptcy Court found no evidence that Tousignant's decision to enter into the Agreement was based on "extraneous considerations or influences" or that Tousignant

28

"intentionally acted with a purpose other than that of advancing the best interests of the

corporation." (D.I. 1 at pp. 21-22). I find no evidence in the record to contradict the Bankruptcy

Court's proposed findings.

### Objections 13-14: Potential Liability for Missed Payroll

Trustee argues that Tousignant suffered from a conflict of interest in entering the Agreement

because Tousignant did not want to face potential liability for missing payroll. (*See* D.I. 2 at 4).

The Bankruptcy Court found that this assertion unsupported by the evidence. "Trustee's allegation

that Tousignant suffered from a conflict of interest ... is attenuated. Other than a single mention of

the statutory obligation to pay employees, there is simply no evidence to support the Trustee's

contention that Mr. Tousignant's actions were driven by naked self-preservation." (D.I. 1 at p. 22).

The Bankruptcy Court therefore declined to apply entire fairness review on this basis. (*Id.* at pp.

22-23).

Trustee cites evidence and case law in support of his objection. Trustee argues that it is

undisputed that Defendants knew about their potential civil and criminal liability and that, without

the cash necessary to make payroll generated by the Agreement, Defendants would have been

exposed to such liability. (*See* D.I. 2 at p. 5). Trustee cites testimony from UE's general counsel

that he had warned the officers and directors of potential liability (*see* D.I. 3 at p. 24 (citing D.I. 4 at

p. 139)), and also cites Keith's testimony that he was aware that officers and directors could be held

liable for the payroll obligations (*see* D.I. 3 at p. 24 (citing D.I. 4 at pp. 620-21, 790)). Trustee

argues that "[i]t is difficult to imagine a more powerful personal motivation than avoiding imminent

civil and criminal liability." (*See* D.I. 3 at p. 24). However, the testimony and communications

cited by Trustee demonstrate Tousignant's knowledge of his potential liability and nothing more. I

do not view Tousignant's knowledge of his potential liability in connection with making payroll – a

potential liability shared by the rest of the officers and directors at UE and, indeed, by all officers

and directors of corporations with employees – sufficient to support a finding of a conflict of

interest. Nor does the record support a finding of divided loyalty. I agree with the Bankruptcy

Court that the record supports a different explanation for Tousignant's efforts to close the

transaction and fund payroll:

> Tousignant's unrebutted and credible testimony at trial reflected
> legitimate concern about the need to keep the company afloat and to
> avoid having to notify the employees and the public of the missed
> payroll in the company's filings with the Securities and Exchange
> Commission. This disclosure would have had a damaging effect on
> Ultimate Escapes' business and put the proposed merger with Club
> Holdings at risk.

(*See* D.I. 1 at p. 22). Additional evidence in the record also supports this explanation. "This

scenario was discussed in a meeting of the Ultimate Escapes audit committee on August 6." (*See*

*id.* (citing D.I. 7 at pp. 220-22)). "It was also the subject of email communication between various

members of [UE's] board and management on August 7, 2010." (D.I. 1 at p. 22 (citing D.I. 4 at p.

1030)). In light of these concerns, the Bankruptcy Court found Tousignant's decision to enter the

Agreement and thereby make payroll upheld his corporate responsibility to affirmatively protect the

interests of the corporation committed to his charge, but also to refrain from doing anything that

would work injury to the corporation." (*See* D.I. 1 at p. 22 (citing *Guth,* 5 A.2d at 510 (internal

quotations omitted))).

In further support of the objection, Trustee cites case law holding that "[e]ntire fairness is

triggered when a director or officer enters into an agreement because he or she perceives that the

agreement will lessen the chances that a legal action is brought against them." (*See* D.I. 2 at 5; *see*

*also* D.I. 3 at 25 (citing *In re Primedia, Inc. S'holders Litig.,* 67 A.3d at 455, 486-87 (Del. Ch.

2013)). In *Primedia,* the Court of Chancery applied the entire fairness standard because "it [wa]s

reasonably conceivable that [a fiduciary] received a unique benefit in the Merger not shared with

other shareholders" because the merger partner would be "reluctant to antagonize" the fiduciary and

30

pursue a derivative action against it. *See id.* at 486-87. Trustee argues that "[i]f perception of

lessening the chances of litigation trigger entire fairness review, then certainly entering into an

agreement knowing it will eliminate the risk of civil and criminal liability does too." (*See* D.I. 3 at

p. 25). *Primedia* addressed the potential liability of a fiduciary under very different facts, and I

disagree that *Primedia* supports Trustee's contention that an agreement that generates cash for a

troubled company is necessarily subject to entire fairness review whenever that cash was necessary

to fund the company's payroll obligations. Neither the record here nor case law cited by Trustee

support a finding that Tousignant suffered from a conflict of interest by virtue of potential liability

for missing payroll. There is no error with the Bankruptcy Court's finding.

### Objections 15-17:  Preservation of Job, Compensation, and Corporate Title

Trustee objects to the Bankruptcy Court's findings that Tousignant's decision to enter the

Agreement was not "based on extraneous considerations or influences" and that Tousignant "did not

receive a personal benefit from the transaction that was not equally shared by the stockholders" (*see*

D.I. 1 at p. 21) on the basis that "[i]t is undisputed that [Defendants] were simultaneously driven to

preserve their jobs, generous salary and compensation packages, and the prestige tethered to their

corporate titles." (*See* D.I. 2 at p. 5). Trustee cites *Trados* in support of his contention that

"compensation from employment is generally material" in considering the personal interests of

fiduciaries. (*See* D.I. 3 at p. 25). Trustee also cites an email from Tousignant to CH's CEO in

which Tousignant communicated:

> I will not accept a role of SVP of Business Devt. [in a merged
> company]. With all due respect, been there many years ago and done
> that. If you want my involvement, the role needs to be meaningful
> (no less than President of the overall club business, with you as CEO).
> Otherwise you will need to provide for negotiated settlements for the
> 3 existing employment agreements with me, Phil [Callaghan] and
> Rich [Keith].

(*See id.* at p. 26 (citing D.I. 4 at pp. 794-95, 1044). Trustee argues that Tousignant had negotiated a "soft landing" for himself with CH, and he therefore strongly preferred the CH merger to other alternative mergers. (*See* D.I. 1 at p. 12; D.I. 3 at p. 26-27). Trustee argues that Tousignant, as "a fiduciary who engineer[ed] a soft landing" was therefore not independent in entering the Agreement with CH. (*See* D.I. 3 at p. 27).

I find no evidence that Tousignant put his own personal interests ahead of that of UE in entering the Agreement. (*See* D.I. 1 at p. 22 (citing *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) (internal quotations omitted))). The Agreement did not include any provisions concerning Tousignant's salary, compensation, or title. (*See* D.I. 4 at p. 806). Trustee cites to no evidence that a "soft landing" agreement was ever reached with CH, despite Tousignant's apparent attempts to negotiate his future position in the merged company or some settlement of his rights under his employment agreement. (*See id.* at p. 1044). Tousignant's efforts to negotiate a future position in the event of a merger does not support a finding that the decision to enter the Agreement was "based on extraneous considerations or influences" or provided any personal financial benefit not equally shared by the stockholders. The record does not support a finding that Tousignant put any potential personal benefits ahead of the corporate merits of the challenged transaction. I find no error in the Bankruptcy Court's decision not to apply entire fairness on this basis.

**Objection 18: Request for Funding from CapSource**

Trustee argues that Tousignant reached his decision to enter into the Agreement by a grossly negligent process that failed to consider all material facts reasonably available. (*See* D.I 3 at p. 28). Trustee therefore objects to the Bankruptcy Court's finding that Tousignant made a last request for funding from CapSource before signing the Agreement. (D.I. 1 at p. 10; D.I. 2 at pp. 5-6). Trustee argues that the call with CapSource to request funding was actually scheduled for 1:30 p.m. on August 9, after Tousignant had signed the Agreement, and therefore the Bankruptcy Court's finding

of fact was incorrect. (D.I. 2 at p. 5; D.I. 3 at p. 30, n.22). In support of this objection, Trustee cites

an invitation to a conference call between Tousignant, Sparks, and Walter Schuppe at CapSource,

which reflects that a call between those parties and others was scheduled for Monday, August 9,

2010 at 1:30 p.m. (*See* D.I. 4 at p. 1078).

Evidence of a scheduled conference call does not contradict Tousignant's testimony at trial

that he and Sparks had a telephone call with Walter Schuppe from CapSource at 8:30 a.m. on

August 9, prior to signing the Agreement, in order to make a last request for funding, and that their

request was denied. (*See* D.I. 4 at pp. 604-05, 608-09). Other evidence in the record supports this

finding as well. (*See* D.I. 4 at p. 1079 (Tousignant's email to Sparks on Monday, August 9, at 2:11

a.m., referring to call scheduled with Schuppe at 8:30 a.m. the following day)). I find no error with

the Bankruptcy Court's finding.

### Objections 19-21:  Personal Loan Guarantees

Trustee argues that Tousignant was not disinterested in the Agreement because he

personally guaranteed a loan provided by CapSource, which had a balance of $89.8 million as of

June 30, 2010, and that one of the triggers for liability under the personal guarantee was a

bankruptcy filing. (*See* D.I. 2 at p. 6). Because funding generated in part by the Agreement

allowed UE to temporarily avoid the otherwise imminent bankruptcy filing, Trustee argues entering

the Agreement also avoided imminent liability on the $89 million guarantee. (*See id.*) Trustee

argues this was a benefit or potential benefit that triggered entire fairness review. (*See id.*) On this

basis, Trustee objects to the Bankruptcy Court's findings that the decision to enter into the

Agreement was not based on "extraneous considerations or influences" and Tousignant did not

receive a personal benefit from the transaction that was not shared equally by the stockholders when

he entered into the Agreement. (*See id.*)

33

The Agreement did not confer any personal financial benefit upon Tousignant. (*See* D.I. 4 at p. 806). Multiple witnesses (including Trustee's own witnesses) rejected the proposition that Tousignant had personally profited or realized any pecuniary gain from the Agreement. (*See* D.I. 1 at p. 21 (citing depositions of Sparks (D.I. 7 at p. 105); Schuppe (*id.* at p. 150); Frantz (*id.* at p. 181); Wolf (*id.* at p. 391)); and Griessel (*id.* at p. 394)). Moreover, the Bankruptcy Court noted "it is not at all clear that Tousignant would have been able to escape from under his personal guarantee if a merger was consummated." (D.I. 1 at p. 21). Rather, as noted by the Bankruptcy Court, the record supports a finding that "Tousignant would likely have been required to personally guarantee the debt of the combined company if Club Holdings and Ultimate Escapes ultimately merged." (*Id.* at p. 21, n.33 (citing D.I. 7 at pp. 151-58, 358-74, 375-84 (drafts of merger term sheet contemplating guarantee))). The record supports these findings.

The record supports a finding that in entering the Agreement, Tousignant acted in the best interests of the corporation in progressing toward the proposed merger and avoiding imminent bankruptcy and the negative consequences that would flow from such a filing. (*See* D.I. 1 at p. 31 (noting "a bankruptcy filing would have killed the merger with Club Holdings and wiped out all shareholders")). The funding generated by the Agreement – in addition to the funding generated by the 1600 Broadway sale – temporarily averted UE's financial crisis and gave it time to consummate the merger, which the Board agreed was the right path forward. (*See id.* at p. 21). The fact that the funding generated in part by the Agreement had the additional effect of delaying a bankruptcy filing – which would have triggered the personal guarantee but would have had many other negative consequences for UE – does not itself support a finding of divided interests. I agree with the Bankruptcy Court's conclusion that Trustee failed to adduce evidence that Tousignant "intentionally acted with a purpose other than that of advancing the best interests of the corporation" and that

34

entire fairness review was not warranted on this basis. (*See id.* at pp. 21-22 (citing *Walt Disney*,

906 A.2d at 67)).

### Objections 22-25: Grossly Negligent Process

Trustee argues that Tousignant's decision to enter the Agreement was made by a grossly

negligent process, and thus entire fairness is the correct standard of review. (*See* D.I. 3 at p. 28). In

support of this, Trustee argues that Tousignant breached his duty of care because: he failed to

proactively contact general counsel, outside counsel, financial professionals, or investment bankers

regarding the Agreement; he failed to consult UE's Outside Directors regarding the Agreement; and

UE's general counsel, upon first hearing about the Agreement, advised Tousignant not to sign it.

(*See id.* at pp. 28-29; D.I. 2 at pp. 6-7). In support of these contentions, Trustee objects to several of

the Bankruptcy Court's related findings in connection with Tousignant's decision to enter into the

Agreement.

Trustee argues that Tousignant never consulted UE's Outside Directors about the Agreement

(*see* D.I. 2 at p. 6) and objects to the Bankruptcy Court's finding that Tousignant "was in constant

contact with Ultimate Escapes' officers and directors about the state of the company's affairs." (*See*

D.I. 1 at p. 30). However, the record supports the finding that Tousignant was in constant contact

with UE's officers and directors regarding UE's state of affairs in the days leading up to the

Agreement. (*See e.g.,* D.I. 7 at p. 411 (Aug. 6, 2010 email from Tousignant to members of UE's

Board, general counsel, and outside counsel attaching draft term sheet for a $15 million senior

secured term loan from a third party investment firm); D.I. 4 at p. 1030 (Aug. 7, 2010 emails

between Tousignant and members of UE's Board discussing current state of negotiations of CH

merger and missed payroll)).

Trustee contends that Tousignant breached his duty of care because he did not proactively

contact UE's general counsel or outside counsel about the Agreement. (*See* D.I. 2 at 6-7). Trustee

therefore objects to the Bankruptcy Court's finding that Tousignant shared the Agreement with the UE's CFO Callaghan and general counsel Sparks on August 8, 2010 because that finding ignores the fact that Tousignant did not initiate the communication. (*See* D.I. 3 at p. 29). The record, however, supports the Bankruptcy Court's finding that Tousignant shared the Agreement with Sparks and Callaghan on Sunday, August 8, 2010 and requested redline changes. (*See* D.I. 1 at p. 28, n.53 (citing Aug. 9, 2010 emails from Tousignant to Callaghan asking for his interpretation of the Agreement, and from Tousignant to Sparks asking him to redline the Agreement to remove some of the more difficult language); *see also* D.I. 4 at pp. 140-42 (Sparks' deposition testimony)).

Trustee further objects to the Bankruptcy Court's conclusion not to draw a negative inference from Tousignant's delay in communications regarding the Agreement, based on the fact that Tousignant, Callaghan, and Sparks worked throughout the weekend interviewing restructuring consultants and finalizing documents for the close of the sale of 1600 Broadway – the key generator of cash to satisfy UE's funding needs – and that these responsibilities were equally as important to UE's survival. (*See* D.I. 1 at p. 28). The record supports a finding that Tousignant was engaged in these efforts the weekend of August 6 through August 8. (*See e.g.,* D.I. 7 at pp. 209-12, 416-19 (Aug. 8 emails between Tousignant, Callaghan, Sparks, and chief operating officer Bob Glinka).

Trustee further objects to the Bankruptcy Court's finding that "the record does not reflect that [UE's general counsel] emailed a redline of the document or provided one when he met Mr. Tousignant at the Ultimate Escapes' office Monday morning" (*see* D.I. 1 at p. 10) because that finding: (i) does not reflect that Tousignant was grossly negligent in requesting redline changes "for the first time in the middle of the night at 2:11 a.m. … only a few hours before he had to sign the Agreement and without any time to renegotiate it after already having agreed to it" (*see* D.I. 3 at 30); (ii) "wholly ignores that the General Counsel only learned of the Agreement hours before it had to be signed to effect payroll" (*see id.*); and (iii) "wholly ignores that the General Counsel expressed

his serious reservations about the Agreement to Tousignant on two separate occasions" (*see id.*).

However, the record does not reflect that any redline version of the Agreement was sent to

Tousignant.

I observe that the Agreement was badly drafted. Tousignant's understanding of the

Agreement was consistent, however, with the email sent by Estler on August 6, in which he

confirms that UE will work with CH to "transfer 10 members per home to help us carry costs."

(*See* D.I. 4 at p. 1072). As the Bankruptcy Court observed, "[g]iven competing interpretations of

the [Agreement], Estler's contemporaneous statements regarding the purpose behind this section of

the Agreement are dispositive." (*See* D.I. 1 at 25). I find no evidence in the record that Sparks had

a different understanding of the intent of the Agreement. The record reflects that the concerns

raised by Sparks to Tousignant upon his review of the Agreement on August 8 related to the

business aspects of the Agreement, as opposed to any legal implications the Agreement may have

with respect to the confidentiality and permitted use of the Membership Information. (*See* D.I. 4 at

p. 1080 (Sparks' email to Tousignant and Callaghan, stating "I think we should redline this to

remove the provisions that are unacceptable ... It doesn't make sense to take such a hit on the leases,

and lose members, and agree to sell our elite home when we could get the same dollars from

[CapSource] without all of this.")). The record does not reflect that Tousignant was a lawyer, and

unless he read the Agreement with a keen legal eye, he also would not have recognized the poorly

drafted language that CH later relied upon as a basis for its mass solicitation of UE's members.

Overall, Trustee does not appear to dispute the substance of the Bankruptcy Court's

findings, which tend to undermine Trustee's arguments that the decision to enter into the Agreement

resulted from a grossly negligent process and that Tousignant failed to consider material facts when

making that decision. Rather, Trustee's objections focus on findings that the Bankruptcy Court

should have made in addition to the above findings. (*See* D.I. 2 at pp. 6-7; D.I. 3 at pp. 29-30). The record, however, supports the Bankruptcy Court's specific findings.

### Objection 26: Enhanced Scrutiny

"[I]t is Trustee's first and primary position that the [Agreement] was not a merger and was not a transaction that contemplated a later merger. Therefore entire fairness review applies." (*See* D.I. 3 at 31). Because the Bankruptcy Court has proposed findings of fact that directly conflict on this issue, however, Trustee argues "in the alternative only" that enhanced scrutiny should apply because the Agreement related to a sale with CH. (*See id.*) Trustee argues that enhanced scrutiny applies in every case in which a fundamental change of corporate controls occurs or is contemplated. (*See id.* (citing *Paramount Commc'ns v. QVC Network Inc.*, 637 A.2d 34, 46 (Del. 1994)). Thus, Trustee argues, enhanced scrutiny review applies to both a sale transaction and a transaction related to a sale. (*See id.*) Trustee further argues that courts apply enhanced scrutiny to lock up agreements entered into during a sale process, including sale of a company's 'crown jewel' assets to a favored bidder. (*See id.* (citing *Mills Acquisition Co. v. Macmillan*, 559 A.2d 1261, 1285-86 (Del. 1989) (when lockup agreements involve "crown jewel" assets, careful board scrutiny attends the decision)). Trustee argues enhanced scrutiny applies here because the Agreement sold or compromised UE's crown jewel (its Membership Information) in an attempt to lockup the merger with CH. (*See id.* at p. 32).

In support of this alternative argument, Trustee objects to the Bankruptcy Court's finding that it was inappropriate to apply enhanced scrutiny because the Agreement was not a transaction related to a sale such "that a fundamental change of control occurs or is contemplated." (*See* D.I. 1 at p. 20 (citing *Paramount*, 637 A.2d at 46). Trustee argues that this finding is contrary to the Bankruptcy Court's finding that Tousignant had authority to enter the Agreement because the Agreement was an act "in connection with the consummation of the [CH merger] transaction" as

authorized by the Board resolutions on June 10, 2010. (*See id.* at p. 21, 26). Trustee argues that the Agreement cannot constitute a step to consummate the CH merger for purposes of Tousignant's authority to enter into the Agreement, but not constitute part of a sale or contemplated change of control for purposes of enhanced scrutiny. (*See* D.I. 3 at pp. 32-33).

I disagree that enhanced scrutiny is warranted on this basis. First, the Bankruptcy Court found that the Agreement intended to transfer thirty UE members to fund the carrying costs of the leased properties – not the "crown jewel" Membership Information. (*See* D.I. 1 at 25). As set forth in greater detail below, the record supports this finding. Second, the Bankruptcy Court found that, by its terms, the Agreement did not effectuate a change of control, is not a merger agreement, a final stage transaction, or any of the "specific recurring, and readily identifiable situations" in which courts apply enhanced scrutiny. (*See* D.I. 1 at p. 23 (citing *Trados*, 73 A.3d at 43)). While the Agreement, which generated a portion of the cash necessary to keep UE alive pending the merger, was certainly an act taken "in connection with the consummation of the [CH merger] transaction" (*see id.* at p. 26), it was not an action related to a sale or merger such that a fundamental change of control occurred or was contemplated. *See Paramount*, 637 A.2d at 46. As the Bankruptcy Court observed, it is undisputed that the parties continued negotiating the merger for weeks following execution of the Agreement. (*See* D.I. 1 at p. 24). I find no error in the Bankruptcy Court's conclusion that enhanced scrutiny was not appropriate on this basis.

### Objection 27: Corporate Waste Argument

As summarized by the Bankruptcy Court, "[d]espite this being an atypical case for enhanced scrutiny, the Trustee argues that the standard is appropriate as the [Agreement] constituted corporate waste because the company's membership information was sold for disproportionately small consideration." (*See* D.I. 1 at p. 24). Trustee objects on the basis that the Bankruptcy Court based it analysis on an incorrect understanding of Trustee's position – that Trustee sought enhanced

scrutiny review in the alternative because the Agreement constituted waste. (*See* D.I. 2 at p. 8).

Trustee argues that I should reject this reference and disregard Trustee's waste argument when

considering whether enhanced scrutiny review was appropriate. (*See id.*) This is the only mention

of the waste argument in Trustee's papers, and Trustee does not argue that the Bankruptcy Court's

consideration of corporate waste in this context affected its overall findings and conclusions.

Under Delaware law, when a plaintiff fails to rebut the presumption of the business

judgment rule, the plaintiff is not entitled to any remedy, be it legal or equitable, unless the

transaction constitutes waste. *See Walt Disney*, 907 A.2d at 747 (citing *J.P. Stevens*, 542 A.2d at

780). Because the Bankruptcy Court ultimately concluded that Trustee failed to carry the

evidentiary burden of rebutting the business judgment presumption, it was appropriate for the

Bankruptcy Court to consider Trustee's waste claim. "To prevail on a waste claim ... plaintiff must

overcome the general presumption of good faith by showing that the board's decision was so

egregious or irrational that it could not have been based on a valid assessment of the corporation's

best interests." (*See* D.I. 1 at p. 24 (citing *Kaufman v. Allemang*, 2014 WL 4954333 at *10 (D. Del.

Sept. 30, 2014)).

I agree that the record does not support a finding of waste. Like the Bankruptcy Court, I am

not convinced that the Agreement constituted a sale of UE's Membership Information. As an initial

matter, nowhere in the Agreement is the sale of an asset, tangible or intangible, discussed. (*See* D.I.

4 at pp. 806-09). Rather, the Agreement appears only to modify the confidentiality restrictions

contained in the Confidentiality Agreement and LOI. (*See id.* at p. 807). I agree "it is more

reasonable and consistent with the evidentiary record to interpret the Agreement as providing for a

limited solicitation of [UE's] members." (*See* D.I. 1 at p. 25). The modification of confidentiality

restrictions allowed for the transfer of UE's members, which would support the costs of the

transferred leased properties contemplated under the Agreement; otherwise, as noted by the

Bankruptcy Court, CH would have taken on the lease liability without any stream of revenue to pay the operating costs on those properties. (*See id.*).

I find that this interpretation is supported by the Agreement itself, witness testimony, and other communications in the record. Estler's email to Tousignant on August 6, 2010 regarding the draft Agreement noted that UE would work with CH to "transfer 10 members per home to help us carry costs." (*See id.* at p. 1072). Tousignant also testified credibly that "it was customary in the industry to aim to occupy a new property with 10 members in order to have sufficient income to pay property operating costs" and that "he viewed the waiver of Confidentiality Agreement to be in the context of the transfer of 30 members." (*See* D.I. 4 at pp. 625-27, 648). I agree with the Bankruptcy Court that the record supports a reading of the Agreement as providing for the modification of the parties' confidentiality restrictions for the limited purpose of allowing the transfer of approximately thirty UE members to CH, as opposed to the sale of the Membership Information. The record does not support a finding that Tousignant's decision to enter the Agreement for $115,000 consideration was "so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *See Kaufman*, 2014 WL 4954333 at *10.

### Objection 28: Inconsistent Rulings

Trustee objects to the Bankruptcy Court's conclusion that "the [Agreement] only intended for the transfer of member information for the limited purpose of converting approximately thirty (30) [UE] members to CH" (D.I. 1 at p. 2) and to similar statements throughout the proposed FFCL. (*See* D.I. 2 at p. 8). Trustee argues that the Bankruptcy Court erred in reaching this conclusion because it cannot be reconciled with the Bankruptcy Court's previous interpretation of the Agreement. (*See id.* at pp. 8-9). On September 21, 2010, after filing for protection under chapter 11 of the Bankruptcy Code, UE filed a complaint against CH, along with a motion for TRO and

41

preliminary injunctive relief, which sought to enjoin CH from further solicitation of UE's members.

(*See Ultimate Escapes Holdings, LLC, et al. v. Club Holdings, LLC*, Adv. No. 10-53064-BLS, D.I.

1, 3). At a hearing held on September 29, 2010, the Bankruptcy Court entered a bench ruling

denying the TRO on the basis that UE had not carried its burden in establishing a likelihood of

success on the merits. This holding was based on the Bankruptcy Court's finding that the

Agreement contemplated CH's right to use the Membership Information to solicit UE's members

and that the Agreement provided that such use would not give rise to a violation under the

Confidentiality Agreement or LOI. (*See* D.I. 4 at pp. 1016-18).

An analysis of Trustee's breach of fiduciary duty claims is far different from the TRO

analysis undertaken by the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure

7065. With respect to UE's request for TRO, the Bankruptcy Court was required to review the

Agreement after CH had already solicited UE's members and to balance UE's probability of

success on the merits against the consequences of immediate irreparable injury.[8] Here, in a

completely different exercise, the Bankruptcy Court reviewed Tousignant's decision to enter the

Agreement under the business judgment standard and looked to what Tousignant reasonably knew

at the time. "Regardless of the fact that Club Holdings eventually mass solicited Ultimate Escapes'

members in September ..., the Court must focus on what Tousignant 'knew and did at the time' of

the challenged transaction." (*See* D.I. 1 at 30 (citing *Chen v. Howard-Anderson*, 87 A.3d 648, 665

(Del. Ch. 2014)). The Bankruptcy Court found that the intent of the Agreement was to convert

---

[8] A party seeking a TRO or preliminary injunction must demonstrate: (i) a reasonable likelihood of success on the merits; (ii) a likelihood that it will suffer irreparable harm if relief is denied; (iii) that the nonmoving party will not suffer even greater harm if the injunction is granted; and (iv) that the public interest favors such relief. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). In deciding whether to issue an injunction, the Court must engage in "a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury." *See GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 2006 WL 1792856 at *3 (3d Cir. 2006).

approximately thirty UE memberships to CH to cover carrying costs on the leases. (*See* D.I. 1 at p. 2). Because the Agreement provided UE with a necessary cash infusion at a critical juncture, the Bankruptcy Court found Tousignant's decision to enter into the Agreement was attributable to a rational business purpose. (*See id.* at p. 31). I do not find the Bankruptcy Court's findings inconsistent with its ruling at the September 29, 2010 hearing.[9]

### Objection 29: Membership Information Value

Trustee objects on the basis that, aside from finding that "[t]he combination of initiation fees, membership dues, and ad hoc fees was Ultimate Escapes' primary source of revenue" (D.I. 1 at p. 3), the Bankruptcy Court failed to address the value of the Membership Information in its FFCL. (*See* D.I. 2 at p. 9; D.I. 3 at 37). Specifically, Trustee argues that the Bankruptcy Court failed to consider that the Membership Information was UE's most valuable asset and ignored "five insider and independent expert valuations that all valued the Membership Information at approximately $40 million." (*See* D.I. 3 at 37). Trustee argues that "[b]ecause the Membership Information value is important for calculating damages and understanding the factual dynamics of this case, the District Court should supplement the Findings to reflect that the Membership Information was worth approximately $40 million." (*See id.* at p. 38) Alternatively, Trustee argues that the District Court should request further briefing or hold further evidentiary proceedings on damages that were also the subject of expert testimony. (*See id.*) Because I adopt the Bankruptcy Court's determination that the business judgment rule applies, I do not require further briefing or evidentiary proceedings on the value of the Membership Information or related damages.

---

[9] I also note that even if they were inconsistent, that would not be a reason to reject the Bankruptcy Court's decision on the merits. Decisions on injunctive relief are not binding on merits decisions.

**Objection 30:  8 Del. C. § 102(b)(7)**

Trustee objects to the Bankruptcy Court's silence regarding the parties' arguments under 8

Del. C. § 102(b)(7).[10]  Trustee argues that "[t]he Bankruptcy Court's silence may be excused if the

District Court finds that Defendants did not breach any standard of conduct under any standard of

review." (*See* D.I. 2 at p. 9).  I agree there was no need for the Bankruptcy Court to reach the issues

raised by the parties under 8 Del. C. § 102(b)(7) because the Bankruptcy Court found no evidence

that Defendants breached their fiduciary duty of care.

## V.    CONCLUSION

For the foregoing reasons, I overrule the Trustee's objections and adopt the Bankruptcy

Court's February 5, 2015 proposed findings of fact and conclusions of law.  An appropriate order

shall issue.

---

[10] The parties submitted post-trial briefing addressing whether the § 102(b)(7) defense was available
to Defendants.  Defendants argued that if the Bankruptcy Court determined that Trustee had
rebutted the business judgment presumption and that Defendants had breached their fiduciary duty
of care to UE, then the exculpatory provision in UE's Certificate of Incorporate barred any
monetary recovery for such a breach.  Trustee argued that (i) Defendants waived their § 102(b)(7)
defense because they failed to plead the defense in their answer; (ii) the exculpatory provision did
not apply to Tousignant because he was acting only as an officer; and (iii) the exculpatory provision
did not apply to Keith because he acted in bad faith.

44